**COLE SCHOTZ P.C.**
David M. Kohane
Eric S. Latzer
Mark J. Pesce
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey  07602-0800
201-489-3000
201-489-1536  Facsimile
Attorneys for Plaintiff, Nancy Smith,
individually and on behalf of the Estate of William Smith

| | |
|---|---|
| NANCY A. SMITH, individually and as the Administrator of the ESTATE OF WILLIAM L. SMITH,<br><br>                        Plaintiff,<br><br>        v.<br><br>TOWNSHIP OF WARREN, SOMERSET COUNTY, NEW JERSEY OFFICE OF EMERGENCY MANAGEMENT, STATE OF NEW JERSEY, CHRISTOPHER J. CHRISTIE, in his official capacity as the Governor of the State of New Jersey, COLONEL RICK FUENTES, in his official capacity as the New Jersey Director of Emergency Management, and JOHN DOES 1-10,<br><br>                        Defendant. | UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY CIVIL ACTION NO. 3:14-cv-07178 (MAS)(LHG)<br><br><u>Civil Action</u><br><br>**FIRST AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

        Plaintiff, Nancy A. Smith ("Nancy" or "Plaintiff"), individually and as the Administrator

of the Estate of William L. Smith ("William"), by way of Complaint against Defendants,

Township of Warren ("Warren"), Somerset County ("Somerset"), the New Jersey Office of

Emergency Management (the "OEM"), the State of New Jersey ("New Jersey" or the "State"),

Christopher J. Christie, in his official capacity as the Governor of the State of New Jersey

("Governor Christie"), and Colonel Rick Fuentes, in his official capacity as the New Jersey

Director of Emergency Management ("Colonel Fuentes") (collectively, "Defendants"), alleges and states as follows:

## NATURE OF ACTION

1.      This action is brought pursuant to Title II of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12131, *et seq.*; Section 504 of the Rehabilitation Act of 1973 (the "Rehabilitation Act"), 29 U.S.C. § 794, *et seq.*; the Fair Housing Act (the "FHA"), 42 U.S.C. § 3601, *et seq.*; 42 U.S.C. § 1983 ("Section 1983"); and the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1, *et. seq.* (the "NJLAD").  Plaintiff seeks damages and equitable relief as a result of Defendants' discriminatory acts, which culminated in William's tragic and premature death and which harmed, and continue to harm, Nancy.

## THE PARTIES

2.      Plaintiff Nancy A. Smith is an individual residing in the Township of Warren, County of Somerset.  Nancy suffers from Parkinson's Disease.  Nancy is, and at all relevant times was, a disabled person as that term is defined under the ADA, Rehabilitation Act, FHA, and NJLAD.

3.      The Estate of William L. Smith is represented by Nancy A. Smith, who serves as the Administrator of the Estate.  Before his death, William suffered from dementia and Alzheimer's Disease.  William was, at all relevant times until his death, a disabled person as that term is defined under the ADA, Rehabilitation Act, FHA, and NJLAD.

4.      Defendant State of New Jersey is a governmental entity with a headquarters located in Trenton, New Jersey.

5.      Defendant Township of Warren is a municipal corporation of the State of New Jersey with an address of 46 Mountain Boulevard, Warren, New Jersey.

2

6.    Defendant Somerset County is a governmental entity with its headquarters in Somerville, New Jersey.   The Township of Warren, where Plaintiff resides, is located in Somerset County.

7.    Defendant Christopher J. Christie is sued in his official capacity as the Governor of the State of New Jersey.   Governor Christie has the overall responsibility for emergency management throughout the State, including the authority to declare a State of Emergency.   The Office of the Governor is located in Trenton, New Jersey.

8.    Defendant New Jersey Office of Emergency Management is an agency or department of the State of New Jersey with a headquarters in Trenton, New Jersey.   The OEM, on behalf of Governor Christie, coordinates, directs, and controls all emergency management activities throughout the State.

9.    Defendant Colonel Rick Fuentes is sued in his official capacity as the New Jersey State Director of Emergency Management.   He also serves as the Superintendent of the New Jersey State Police, which is headquartered in West Trenton, New Jersey.

10.    Defendants John Does 1-10 (said names being fictitious) are agencies and/or departments of the State which, during the relevant time period described below, participated in emergency preparedness and planning and the provision of essential services and programs before, during, and after an emergency.  This includes, but is not limited to, such agencies and/or departments of the State which received federal funding for emergency preparedness and planning and the provision of essential services and programs before, during, and after an emergency.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over the ADA, Rehabilitation Act, FHA, and Section 1983 claims pursuant to 28 U.S.C. §§ 1331 and 1343 and supplemental jurisdiction over the NJLAD claims pursuant to 28 U.S.C. § 1367.  This Court has jurisdiction to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

12.     Pursuant to 28 U.S.C. § 1391(b), venue is proper in this District, because a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District.

## FACTUAL ALLEGATIONS

### A.     Defendants' Obligations To Account For Disabled Individuals When Faced With A Natural Disaster

13.     Superstorm Sandy (the "Storm") struck New Jersey on or about October 29, 2012.

14.     At the time of the Storm – and for many years prior – Defendants were on notice that New Jersey was highly susceptible to the effects of natural disasters and other emergencies. Indeed, as recently as 2011, Hurricane Irene and Storm Alfred (a/k/a "Snowtober") had a devastating impact on New Jersey.

15.     The threat of natural disasters required Defendants to implement effective emergency preparedness and planning, including the provision of certain essential components, such as shelter and care for people forced to evacuate their homes, public notification and communication before and during emergencies, and assistance with evacuation and transportation from affected areas.

16.     The threat of natural disasters also required Defendants to ensure that these essential components were equally available to individuals within the general public who are most vulnerable when faced with a natural disaster: people with disabilities.

4

17.     Specifically, Defendants were required to ensure that people with disabilities would have full and equal access to all aspects of emergency preparedness programs and services, and that people with disabilities would not be prevented by virtue of their disability from participating in and obtaining the benefits of such programs and services.

18.     Defendants were well aware of these obligations, particularly with respect to disabled individuals, both at the time of the Storm and for many years prior.

19.     In fact, more than four years before the Storm struck, the OEM issued a revised 125-page report entitled "Specialized Shelter Planning."  The report emphasized the importance of, and the need for the state and local governments to implement, appropriate emergency planning for disabled persons.  The report described disabled persons as "a particularly vulnerable demographic within our population."

20.     The OEM's website similarly emphasizes its commitment to so-called "Whole Community Planning."  According to the website:

> The NJOEM is committed to whole-community planning: emergency planning that involves entire communities and not just government agencies. By including the full spectrum of people and organizations represented in a community, emergency planning will account for the needs of all communities' members, regardless of their personal circumstances or abilities. We include individuals with functional needs, advocates and human service providers in all phases of the emergency management process - mitigation, preparedness, response and recover. **There is nothing "special" about insuring everyone can access mass care shelters, understand emergency information, evacuate safely or receive recovery information. Whole-community planning is something we practice as a normal course of business, because every life matters.**

(Emphasis added).

21.     Defendants' legal and ethical duty to provide equal and appropriate emergency planning and care to disabled people was reinforced by Colonel Fuentes, the Director of the

OEM, just months before the Storm struck.  In a press release issued on May 24, 2011, during "National Hurricane Preparedness Week," Colonel Fuentes stated:

> Our goal is inclusion of people with disabilities in emergency preparedness, and insuring access and integration of people with functional needs into all our emergency management activities . . . . Every life matters.  **We need to reverse the trend of people with disabilities being disproportionately impacted by disasters.  We have a legal – but more importantly – an ethical obligation to do so.**

(Emphasis added).

22.      Before, during, and after the Storm, Defendants appropriately ensured that essential components, such as shelter and care, were available to the general public.

23.      Critically, however, Defendants wholly failed to account for Nancy and William – two of the very individuals whom the OEM and Colonel Fuentes had earlier described as "particularly vulnerable" and "disproportionately impacted by disasters."

24.      As a result of Defendants' failures, Plaintiff has sustained, and continues to sustain, substantial damages.

**B.      Defendants' Discriminatory Acts In Connection With Superstorm Sandy**

25.      At the time of the Storm, Nancy and William resided with their daughter, Deborah Smith ("Deborah," together with Nancy and William as the "Smiths"), in their home located at 10 Jennifer Lane, Warren, New Jersey.

26.      When Hurricane Irene struck in 2011, Nancy suffered a fall and the hurricane prevented her from obtaining the medical care she needed.

27.      Thus, after Hurricane Irene struck New Jersey in 2011, a representative from Somerset had urged Deborah to register her parents with the New Jersey Special Needs Registry.

28.      According to a press release issued by Somerset, the Special Needs Registry was "designed to help people who may have difficulty during an evacuation because of physical or

6

cognitive limitations[.]"    The State urged disabled individuals to register "so emergency responders [could] better plan to serve them in a disaster or other emergency."

29.    Approximately four or five days before the Storm, Deborah registered Nancy and William with the "Special Needs Registry" offered by the State.

30.    As part of the registration process for the Special Needs Registry, Deborah provided Defendants with her parents' home address and advised that Nancy and William were both elderly and disabled individuals.

31.    In anticipation of the Storm, Deborah unsuccessfully attempted to locate a shelter that could accommodate disabled persons.    In particular, Deborah was unable find such information on the internet.

32.    Approximately 24 to 48 hours before the Storm hit, Carolann Garafola, the mayor of Warren, contacted Deborah.    By that time, weather forecasts were predicting a major hurricane.

33.    Mayor Garafola stated that Warren was aware that Nancy and William required special assistance.  According to the mayor, the only available shelter in the area – Stonecrest Church – was not equipped to accommodate William and Nancy due to their disabilities.  Upon information and belief, Warren had utilized Stonecrest Church on five prior occasions before the Storm.  On each such occasion, Stonecrest Church could not accommodate disabled persons.

34.    The mayor advised that Nancy and William would be placed in a nursing home, hospital, or assisted living facility during the pendency of the Storm.  The mayor stated that she would be in touch.

35.    Shortly before the Storm hit, on October 28, Deborah was able to reach Mayor Garafola on her cell phone.  Deborah asked the mayor where she should take her parents.  The

mayor explained that the town had changed its plans for Nancy and William.  In response, the mayor gave the phone to Jane Asch from the Office of Emergency Management in Warren.

36.     With the Storm dangerously close to landfall, Deborah spoke with Ms. Asch.  Ms. Asch advised that she had been on a phone call with Governor Christie and it was determined that Nancy and William should stay put in their home.  Ms. Asch further advised that a generator would only be delivered to the home in the event the Smiths lost power.

37.     Nancy and William were unable to quickly evacuate in the event of a disaster, and thus relied on Defendants' assurances that they would provide them with appropriate services and safety.

38.     By relying on the assurances of Warren and Somerset that they would be provided appropriate shelter and safety during the Storm, Nancy and William forewent other opportunities to seek appropriate shelter and safety prior to the Storm's arrival.  Had Warren and Somerset not provided such assurances, Nancy and William could have sought and obtained appropriate shelter and safety on their own.  Thus, Warren's and Somerset's affirmative acts placed Nancy and William in a more dangerous situation than they would have been had Warren and Somerset not acted at all, which subjected Nancy and William to significant harm.

C.     **Nancy and William Suffer During the Storm Due to Defendants' Discriminatory Acts**

39.     When the Storm made landfall on October 29, 2012, the Smiths' home immediately lost power.

40.     Only then did representatives from Warren deliver a generator.  The representatives advised the Smiths that they had successfully installed the generator.

41.     However, the generator immediately failed.

42.     On October 30, a representative from Warren delivered a second generator.

8

43.     The second generator similarly failed.

44.     During the brief period of time when the generators were operating, the generators were incapable of providing the appropriate electricity and heat that the Smiths so desperately needed due to their disabilities.  Indeed, the generators could only power the refrigerator, microwave, a small space heater, and a small light.

45.     Moreover, because the generators had to be kept outside, the Smiths were compelled to leave the back door to their home open to ensure that the appropriate wires could reach the generators.  As a result, cold air permeated the house.

46.     Left in a house without heat or electricity, the Smiths spent several days suffering from the bitter cold, and Nancy's and William's conditions deteriorated significantly.

47.     If Defendants had sufficiently planned for and/or actually provided adequate and nondiscriminatory care to disabled individuals during the Storm, the Smiths would not have needlessly suffered.

D.     **William Dies After Being Involuntarily Removed From His Home**

48.     After Debbie spent several days urgently requesting help from the local authorities, a social worker from Somerset arrived at the Smiths' home on October 31.  The social worker, upon consultation with Pamela Mastro of Somerset, determined that it was necessary to remove William from the home.  According to Ms. Mastro, William presented as a danger to himself or others because he had unplugged the second generator.  Despite Deborah and Nancy's vehement objections, on October 31, William was removed from the home and transported to a psychiatric hospital.

49.     Nancy was left behind, trapped in her home – which still did not have heat or electricity – and without William's companionship.  Nancy's health condition continued to deteriorate.  Nevertheless, Nancy and Deborah were advised to shelter in place.

50.     After being involuntarily removed from the Smiths' home, William was transported to three hospitals over approximately eleven days.

51.     While in the care and custody of the State, William was delivered into hospitals which were vastly underequipped to handle a disaster of the Storm's magnitude.  In fact, for significant periods of time, William was kept in rooms without heat and without adequate clothing to keep him warm.

52.     Two of the hospitals to which the State transferred William, Barnabas Health Behavioral Center and Kimball Medical Center, are located in Lakewood, New Jersey. Lakewood was at the epicenter of the devastation from the Storm.  As a result, it was extremely difficult for Deborah and Nancy to visit William, due to the difficulty of obtaining gas and the significant distance between the hospitals and the Smiths' home in Somerset County.

53.     Away from his family and kept in substandard conditions, William's condition drastically deteriorated.

54.     Ultimately, on November 10, 2012, William passed away.

E.      **Nancy Is Eventually Taken To A Shelter That Is Unable To Accommodate Her Due To Her Disability**

55.     On or about November 4, 2012, six days after the Storm, Yee Jao, an officer from Warren's emergency management division, advised Deborah and Nancy that there was room for them at a shelter that had been opened at Bernard's High School, located at 25 Olcott Avenue in Bernardsville, New Jersey.  Jao stated that the facility was accessible to the disabled and could accommodate an individual confined to a wheelchair.

56.     Nancy and Deborah arrived at Bernard's High School on or about November 4, 2012.

57.     Bernard's High School was beset with issues which made it inappropriate for Nancy and other disabled persons.  For instance, but without limitation:

A.      Nancy and other disabled persons were housed upstairs, while non-disabled individuals were kept downstairs.

B.      The elevator was not functioning, and the high school was not equipped with appropriate ramps.  As a result, disabled individuals faced difficulty making it upstairs, and when they finally did make it upstairs, they were effectively trapped on the second floor.

C.      When the women's bathroom on the second floor broke down, the female disabled persons were compelled to use the men's room on the second floor.

D.      The bathroom upstairs was not handicapped accessible.  For example, the bathroom stalls could not accommodate Nancy's wheelchair.

E.      Unlike the downstairs bathroom, the upstairs bathroom did not have a shower.

F.      The upstairs area was not equipped with appropriate power outlets.

G.      Unlike the non-disabled individuals on the first floor of the high school, the disabled persons did not have access to hot water.

H.      The water fountains were not handicapped accessible.

I.      The sleeping arrangements were not appropriate for handicapped individuals.

J.      The doors did not open automatically to accommodate Nancy and other individuals confined to wheelchairs.

11

K.     The high school did not have any medical equipment or supplies.

58.     Upon information and belief, Bernard's High School was open to the general public as an emergency shelter until at least November 14, 2012.  During that time, Bernard's High School was not equipped to accommodate disabled individuals, such as Nancy and William.

**F.     Defendants' Discriminatory Acts Caused Substantial Damages to Plaintiff**

59.     By failing to provide Nancy and William with access to public facilities and services before, during, and in the aftermath of the Storm, Defendants have caused significant physical, emotional, and monetary harm to Plaintiff.

60.     To date, Defendants have failed to implement an adequate disaster relief program for disabled persons, such as Nancy.

61.     Because New Jersey is particularly susceptible to similar disasters, the harm from Defendants' lack of an adequate disaster relief program for disabled persons is ongoing and must be addressed immediately before the next natural disaster inevitably strikes.

62.     If Defendants' failures are left unaddressed, Nancy is likely to be harmed in the future when another natural disaster or emergency strikes New Jersey.

**FIRST COUNT**
**(Violation of the Americans with Disabilities Act, 42 U.S.C. § 12132, *et seq.*)**
**(As to all Defendants)**

63.     Plaintiff repeats and realleges the allegations contained in the preceding paragraphs as if stated fully herein.

64.     Title II of the ADA prohibits a public entity from excluding a person with a disability from participating in or denying the benefits of a program of the public entity to a person with a disability or otherwise discriminating against a person on the basis of disability. Specifically, Title II states, in relevant part, as follows:

> No qualified individual with a disability shall, by reason of such disability, be excluded from participating in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

65.     The term "disability" includes physical and mental impairments that substantially limit one or more major life activities.  42 U.S.C. § 12102(2).  A "qualified individual with a disability" means an "individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."  42 U.S.C. § 12131(2).

66.     Nancy is, and at all relevant times was, a person with a disability within the meaning of the ADA in that she suffers from Parkinson's Disease.

67.     William was, at all relevant times until his death, a person with a disability within the meaning of the ADA in that he suffered from dementia and/or Alzheimer's Disease.

68.     A "public entity" includes state and local governments, their agencies, and their instrumentalities.  42 U.S.C. § 12131(1).  Each defendant is a "public entity" within the meaning of 42 U.S.C. § 12131 and 28 C.F.R. § 35.104.

69.     Congress directed the Department of Justice ("DOJ") to promulgate regulations implementing Title II's prohibition against discrimination.  42 U.S.C. § 12134.  Pursuant to this mandate, the DOJ has issued regulations defining the forms of discrimination prohibited by Title II of the ADA.  28 CFR § 35.101 *et seq.*

70.     Pursuant to 28 C.F.R. § 35.130(b)(1)(i),(ii) and (vii), a public entity, in providing any aid, benefit, or service, may not directly or through contractual, licensing, or other arrangements, on the basis of disability (i) deny qualified individuals with disabilities the

13

opportunity to participate in or benefit from the aid, benefit, or service; (ii) afford qualified individuals with disabilities an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded to others; or (iii) otherwise limit qualified individuals with disabilities in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service.

71.     In addition, pursuant to 28 C.F.R. § 35.130 "[a] public entity may not, in determining the site or location of a facility, make selections . . . [t]hat have the effect of excluding individuals with disabilities from, denying them the benefits of, or otherwise subjecting them to discrimination . . . ."

72.     Defendants provide an aid, benefit, or service in the form of an emergency preparedness program.  Defendants did and do so, however, in an unequal manner that denied or limited Nancy and William's ability to enjoy the benefits as non-disabled persons could.  By failing to meet Nancy and William's needs to the same extent as non-disabled persons, Defendants excluded them from participating in, denied them the benefits of, and discriminated against them in Defendants' emergency preparedness programs and services.

73.     Defendants' conduct, as aforesaid, constituted intentional discrimination. Defendants were aware that New Jersey was susceptible to a natural disaster; that disabled people were particularly vulnerable when faced with a natural disaster; and that William and Nancy were disabled individuals.  Nevertheless, Defendants failed to take appropriate steps to ensure that Nancy and William could equally enjoy the benefits of Defendants' emergency preparedness programs and services.

32000/0571-13198118v3

74.     In addition, Defendants' actions had and continue to have a disproportionate adverse impact on Nancy and William, as well as other persons with disabilities, compared with non-disabled persons.

75.     As a proximate result of Defendants' violations of Title II of the ADA, Plaintiff has been injured as set forth herein.

76.     Defendants' conduct, moreover, constitutes an ongoing and continuous violation of the ADA and unless restrained from doing so, Defendants will continue to violate the ADA. Defendants' conduct, unless enjoined, will continue to inflict injury on Nancy for which she has no adequate remedy at law.   Nancy will suffer irreparable harm in that she will continue to be discriminated against and denied access to Defendants' emergency preparedness programs. Consequently, Plaintiffs are entitled to injunctive relief pursuant to section 308 of the ADA, as well as reasonable attorneys' fees and costs.

WHEREFORE, Plaintiff Nancy Smith, individually and on behalf of the Estate of William Smith, demands judgment against Defendants, jointly and severally, as follows:

A.     Compensatory damages;

B.     A declaration that Defendants' failure to adequately plan to meet the emergency preparedness needs of persons with disabilities violates the Americans with Disabilities Act;

C.     An order and judgment enjoining Defendants from violating the Americans with Disabilities Act, and requiring Defendants to develop and implement an emergency preparedness program that addresses the unique needs of people with disabilities during emergencies;

D.     Plaintiff's reasonable attorneys' fees and costs; and

E.      Such other and further relief as this Court deems just and proper.

**SECOND COUNT**
**(Violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794)**
**(As to all Defendants)**

77.     Plaintiff repeats and realleges the allegations contained in the preceding paragraphs as if stated fully herein.

78.     Section 504 of the Rehabilitation Act, and its implementing regulations, prohibit discrimination against persons with disabilities by recipients of federal funding.  Section 504 of the Rehabilitation Act provides, in relevant part, as follows:

> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . .

79.     An "individual with a disability" is defined under the statute, in relevant part, as "an individual who has a physical or mental impairment that substantially limits one or more major life activities of such individual."   29 U.S.C. § 705(20)(B) (referencing 42 U.S.C. § 12012).  "Otherwise qualified" means a person who "meets the essential eligibility requirements for participation in, or receipt of benefits from, that program or activity."  28 C.F.R. § 39.103.

80.     Nancy is, and at all relevant times was, an individual with a disability within the meaning of the Rehabilitation Act, in that she suffers from Parkinson's Disease.  Nancy is otherwise qualified as she is located in Warren and thus eligible for the benefits of the emergency preparedness and response programs of the State, Somerset, and Warren.  Accordingly, Nancy is an otherwise qualified individual with a disability within the meaning of 29 U.S.C. § 794 and its implementing regulations.

16

81.     William was, at all relevant times until his death, an individual with a disability within the meaning of the Rehabilitation Act, in that she suffered from dementia and/or Alzheimer's Disease.  William was otherwise qualified as he was located in Warren and thus was eligible for the benefits of the emergency preparedness and response programs of the State, Somerset, and Warren.   Accordingly, William was an otherwise qualified individual with a disability within the meaning of 29 U.S.C. § 794 and its implementing regulations.

82.     Upon information and belief, Defendants receive federal financial assistance to implement and administer the emergency preparedness and response programs of the State of New Jersey, Somerset County, and Warren Township.

83.     Defendants' conduct, as aforesaid, constituted intentional discrimination.   By failing to meet the unique needs of William and Nancy before, during, and after Superstorm Sandy, Defendants have excluded them from participating in, denied them the benefits of, and discriminated against them in an emergency preparedness program that receives federal financial assistance, solely by reasons of their disabilities, in violation of 29 U.S.C. § 794 and its implementing regulations.

84.     In addition, Defendants' actions had and continue to have a disproportionate adverse impact on Nancy and William, as well as other persons with disabilities, compared with non-disabled persons.

85.     As a proximate result of Defendants' violations of Section 504 of the Rehabilitation Act, Plaintiff has been injured as set forth herein.

86.     Defendants' conduct, moreover, constitutes an ongoing and continuous violation of Section 504 of the Rehabilitation Act and unless restrained from doing so, Defendants will continue to violate the Rehabilitation Act.  Defendants' conduct, unless enjoined, will continue

17

to inflict injury on Nancy for which she has no adequate remedy at law.  Nancy will suffer irreparable harm in that she will continue to be discriminated against and denied access to Defendants' emergency preparedness programs.   Consequently, Plaintiffs are entitled to injunctive relief, as well as reasonable attorneys' fees and costs.

WHEREFORE, Plaintiff Nancy Smith, individually and on behalf of the Estate of William Smith, demands judgment against Defendant, jointly and severally, as follows:

A.   Compensatory damages;

B.   A declaration that Defendants' failure to adequately plan to meet the emergency preparedness needs of persons with disabilities violates Section 504 of the Rehabilitation Act;

C.   An order and judgment enjoining Defendants from violating Section 504 of the Rehabilitation Act, and requiring Defendants to develop and implement an emergency preparedness program that addresses the unique needs of people with disabilities during emergencies;

D.   Plaintiff's reasonable attorneys' fees and costs; and

E.   Such other and further relief as this Court deems just and proper.

### THIRD COUNT
**(Violation of the Fair Housing Act, 42 U.S.C. § 3601, *et seq*.)**
**(As to all Defendants)**

87.   Plaintiff repeats and realleges the allegations contained in the preceding paragraphs as if stated fully herein.

88.   Under 42 U.S.C. § 3604(f)(2), it is unlawful to "discriminate against any person in the . . . provision of services or facilities in connection with such dwelling, because of a handicap."

18

89.     Pursuant to 42 U.S.C. § 3604(f)(3)(B), this includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling."

90.     Under the FHA, a "handicap" is defined as "a physical or mental impairment which substantially limits one or more of such person's major life activities."   42 USCA § 3602(h)(1).

91.     Nancy is, and at all relevant times was, a person with a disability within the meaning of the FHA in that she suffers from Parkinson's Disease.

92.     William was, at all relevant times until his death, a person with a disability within the meaning of the FHA in that he suffered from dementia and/or Alzheimer's Disease.

93.     Defendants provided a "dwelling" within the meaning of 42 U.S.C.A. § 3602(b).

94.     Defendants' conduct, as aforesaid, constituted intentional discrimination under the FHA.

95.     In addition, Defendants' actions had and continue to have a disproportionate adverse impact on Nancy and William, as well as other persons with disabilities, compared with non-disabled persons.

96.     As a proximate result of Defendants' violations of the FHA, Plaintiff has been injured as set forth herein.

97.     Defendants' conduct, moreover, constitutes an ongoing and continuous violation of the FHA and unless restrained from doing so, Defendants will continue to violate the FHA. Defendants' conduct, unless enjoined, will continue to inflict injury on Nancy for which she has no adequate remedy at law.  Nancy will suffer irreparable harm in that she will continue to be discriminated against and denied access to Defendants' emergency preparedness programs.

Consequently, Plaintiffs are entitled to injunctive relief, as well as reasonable attorneys' fees and costs.

WHEREFORE, Plaintiff Nancy Smith, individually and on behalf of the Estate of William Smith, demands judgment against Defendant, jointly and severally, as follows:

A.    Compensatory damages;

B.    A declaration that Defendants' discriminatory provision of shelter during emergencies violates the Fair Housing Act;

C.    An order and judgment enjoining Defendants from violating the Fair Housing Act, and requiring Defendants to develop and implement an emergency preparedness program and provision of emergency shelter that addresses the unique needs of people with disabilities during emergencies;

D.    Plaintiff's reasonable attorneys' fees and costs; and

E.    Such other and further relief as this Court deems just and proper.

## FOURTH COUNT
### (Violation of the Fourteenth Amendment under 42 U.S.C. § 1983)
### (As to Township of Warren and Somerset County, only)

98.    Plaintiff repeats and realleges the allegations contained in the preceding paragraphs as if stated fully herein.

99.    At all relevant times, Nancy and William had substantive and procedural due process rights under the Fourteenth Amendment of the United States Constitution to be free from state-created dangers or risks that could cause significant bodily harm.

100.    Acting under color of state law, Warren and Somerset and their officials engaged in affirmative acts that created and/or increased the risk that Nancy and William would be foreseeably and significantly harmed by the impending Storm.

32000/0571-13198118v3

101.    Through these affirmative acts, Warren and Somerset and their officials acted in willful and/or reckless disregard for Nancy's and William's life, liberty and bodily integrity, in violation of their constitutional rights.

102.    As a direct and proximate cause of Warren's and Somerset's violations of Nancy and William's constitutional rights, Nancy and William suffered substantial damages.

WHEREFORE, Plaintiff Nancy Smith, individually and on behalf of the Estate of William Smith, demands judgment against Defendants, Township of Warren and Somerset County, jointly and severally, as follows:

A.    Compensatory damages;

B.    Pre-judgment interest;

C.    Punitive damages;

D.    Plaintiff's reasonable attorneys' fees and costs; and

E.    Such other and further relief as this Court deems just and proper.

### FIFTH COUNT
**(Violation of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1, *et. seq.*)**
**(As to Township of Warren and Somerset County, only)**

103.    Plaintiff repeats and realleges the allegations contained in the preceding paragraphs as if stated fully herein.

104.    The New Jersey Law Against Discrimination, and its implementing regulations, prohibit discrimination in public accommodations against persons with disabilities.  The NJLAD provides, in relevant part, as follows:

> All persons shall have the opportunity to . . . obtain all the accommodations, advantages, facilities, and privileges of any place of public accommodation . . . without discrimination because of . . . disability . . . subject only to conditions and limitations applicable alike to all persons.
>
> [N.J.S.A. 10:5-4.]

21

105.    The NJLAD also provides, in relevant part:

It shall be . . . unlawful discrimination . . . [for any] . . .agent, or employee of any place of public accommodation directly or indirectly to refuse, withhold from or deny to any person any of the accommodations, advantages, facilities or privileges thereof, or to discriminate against any person in the furnishing thereof . . . on account of the . . . disability . . . of such person.

[N.J.S.A. 10:5-12.]

106.    An individual with a "disability" is defined under the NJLAD, in relevant part, as an individual with a:

physical disability, infirmity, malformation or disfigurement which is caused by bodily injury, birth defect or illness including epilepsy and other seizure disorders, and which shall include, but not be limited to, any degree of paralysis, amputation, lack of physical coordination, blindness or visual impediment, deafness or hearing impediment, muteness or speech impediment or physical reliance on a service or guide dog, wheelchair, or other remedial appliance or device, or any mental, psychological or developmental disability, including autism spectrum disorders, resulting from anatomical, psychological, physiological or neurological conditions which prevents the normal exercise of any bodily or mental functions or is demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques.

[N.J.S.A. 10:5-5.]

107.    Nancy is, and at all relevant times was, an individual with a disability within the meaning of the NJLAD, in that she suffers from Parkinson's Disease.

108.    William was, at all relevant times until his death, an individual with a disability within the meaning of the NJLAD, in that she suffered from dementia and/or Alzheimer's Disease.

109.    A disaster relief shelter qualifies as a "place of public accommodation" within the meaning of N.J.S.A. 10:5-5(l).

110.    Warren and Somerset provide accommodations, advantages, facilities and privileges in the form of an emergency preparedness program.  Warren and Somerset did and do so, however, in an unequal manner that denied or limited Nancy and William's ability to enjoy the benefits as non-disabled persons could.  By failing to meet Nancy and William's needs, Warren and Somerset excluded them from participating in, denied them the benefits of, and discriminated against them in Defendants' emergency preparedness programs and services.

111.    Warren and Somerset's conduct, as aforesaid, constituted intentional discrimination.  Warren and Somerset were aware that New Jersey was susceptible to a natural disaster; that disabled people were particularly vulnerable when faced with a natural disaster; and that William and Nancy were disabled individuals.  Nevertheless, Warren and Somerset failed to take appropriate steps to ensure that Nancy and William could enjoy the benefits of Warren and Somerset's emergency preparedness programs and services.

112.    In addition, Warren and Somerset's actions had and continue to have a disproportionate adverse impact on Nancy and William, as well as other persons with disabilities, compared with non-disabled persons.

113.    As a proximate result of Warren and Somerset's violations of the NJLAD, Plaintiff has been injured as set forth herein.

114.    Warren and Somerset's conduct, moreover, constitutes an ongoing and continuous violation of the NJLAD and unless restrained from doing so, Warren and Somerset will continue to violate the NJLAD.  Warren and Somerset's conduct, unless enjoined, will continue to inflict injury on Nancy for which she has no adequate remedy at law.  Nancy will suffer irreparable harm in that she will continue to be discriminated against and denied access to Warren and

32000/0571-13198118v3

Somerset's emergency preparedness programs.  Consequently, Plaintiffs are entitled to injunctive relief, as well as reasonable attorneys' fees and costs.

WHEREFORE, Plaintiff Nancy Smith, individually and on behalf of the Estate of William Smith, demands judgment against Defendants, Township of Warren and Somerset County, jointly and severally, as follows:

A.    Compensatory damages;

B.    A declaration that Warren and Somerset's failure to adequately plan to meet the emergency preparedness needs of persons with disabilities violates the New Jersey Law Against Discrimination;

C.    An order and judgment enjoining Warren and Somerset from violating the New Jersey Law Against Discrimination, and requiring Warren and Somerset to develop and implement an emergency preparedness program that addresses the unique needs of people with disabilities during emergencies;

D.    Plaintiff's reasonable attorneys' fees and costs; and

E.    Such other and further relief as this Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

32000/0571-13198118v3

Respectfully submitted,


By: */s/ David M. Kohane*
**COLE SCHOTZ P.C.**
David M. Kohane
Eric S. Latzer
Mark J. Pesce
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey  07602-0800
201-489-3000
201-489-1536  Facsimile
Attorneys for Plaintiff, Nancy Smith,
individually and on behalf of the Estate of
William Smith


Dated: June 16, 2016

25