**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

—————————————————————————
NANCY A. SMITH, individually and as the
Administrator of the ESTATE of WILLIAM L.
SMITH,

               Plaintiff,

        v.

TOWNSHIP OF WARREN, SOMERSET
COUNTY, STATE OF NEW JERSEY, NEW
JERSEY OFFICE OF EMERGENCY
MANAGEMENT, CHRISTOPHER J. CHRISTIE,
in his official capacity as the Governor of the State
of New Jersey, COLONEL RICK FUENTES, in his
official capacity as the New Jersey Director of
Emergency Management, and JOHN DOES 1-10,

               Defendants.
—————————————————————————

Civ. Action No. 14-7178-BRM-LHG


**OPINION**

**MARTINOTTI, DISTRICT JUDGE**

     Before this Court are three Motions to Dismiss Plaintiff Nancy A. Smith's (herein referred to as "Plaintiff" in her capacity as both an individual plaintiff and administrator for the Estate of William L. Smith, and referred to individually as "Nancy Smith") First Amended Complaint ("FAC"), pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), brought by Defendants Somerset County ("Somerset") (ECF No. 55), Township of Warren ("Warren") (ECF No. 56), and the State of New Jersey ("New Jersey" or the "State"), the New Jersey Office of Emergency Management (the "OEM"), Governor Christopher J. Christie ("Christie"), and Colonel Rick Fuentes ("Fuentes") (collectively, "State Defendants") (ECF No. 57). Plaintiff, as an individual and in her capacity as

administrator for the Estate (the "Estate") of William L. Smith ("William Smith"), brings this action against Warren, Somerset, New Jersey, the OEM, Christie, in his official capacity as the Governor of the State of New Jersey, and Fuentes, in his official capacity as the New Jersey Director of Emergency Management (collectively, "Defendants"), for allegedly failing to provide Nancy and William Smith with equal access to emergency services during Superstorm Sandy (the "Storm") in violation of Title II of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12131, *et seq.*, § 504 of the Rehabilitation Act of 1973 (the "Rehabilitation Act"), 29 U.S.C. § 794, *et seq.*, the Fair Housing Act (the "FHA"), 42 U.S.C. § 3601, *et seq.*, the Fourteenth Amendment of the United States Constitution, pursuant to 42 U.S.C. § 1983 ("§ 1983"), and the New Jersey Law Against Discrimination (the "NJLAD"), N.J.S.A. 10:5-1, *et. seq.* Plaintiff opposes the pending Motions to Dismiss.

For the reasons set forth herein, the Motions to Dismiss are **GRANTED IN PART** and **DENIED IN PART**.

## I.   BACKGROUND

### A.  Factual Background

The following allegations are taken from Plaintiff's FAC and are assumed as true for the purposes of these Motions to Dismiss. Nancy Smith is a resident of the Township of Warren in Somerset County, suffers from Parkinson's disease, and is confined to a wheelchair. (ECF No. 47 at ¶¶ 2, 57.) William Smith, now deceased, was a resident of Warren in Somerset, and suffered from dementia and Alzheimer's disease. (*Id.* at ¶ 3.) Nancy Smith is the administrator of William Smith's estate. (*Id.*) This action arises from Defendants' alleged failure to provide Nancy and William Smith with equal access to emergency services, in the same way such services were available to non-disabled individuals, before, during, and after Superstorm Sandy.

2

Plaintiff alleges that "Defendants were required to ensure that people with disabilities would have full and equal access to all aspects of emergency preparedness programs and services, and that people with disabilities would not be prevented by virtue of their disability from participating in and obtaining the benefits of such programs and services." (*Id.* at ¶ 17.) During the Storm, Defendants allegedly failed to fulfill these responsibilities and did not provide Nancy and William Smith with sufficient access to emergency services, despite the fact that "[a]t the time of the Storm – and for many years prior – Defendants were on notice that New Jersey was highly susceptible to the effects of natural disasters and other emergencies" and that disabled residents were especially vulnerable to such events. (*Id.* at ¶ 14.)

According to the FAC, prior to the Storm, the OEM and Fuentes openly admitted the importance of their obligation to ensure that individuals with disabilities had adequate access to emergency services. (*Id.* at ¶¶ 18-21.) Four years before the Storm, the OEM issued a revised 125-page report entitled "Specialized Shelter Planning," which allegedly "emphasized the importance of, and the need for the state and local governments to implement, appropriate emergency planning for people with disabilities." (*Id.* at ¶ 19.) Additionally, the OEM's website "emphasizes its commitment to so-called 'Whole Community Planning.'" (*Id.* at ¶ 19.) According to the website:

> The OEM is committed to whole-community planning: emergency planning that involves entire communities and not just government agencies. By including the full spectrum of people and organizations represented in a community, emergency planning will account for the needs of all communities' members, regardless of their personal circumstances or abilities. We include individuals with functional needs, advocates and human service providers in all phases of the emergency management process – mitigation, preparedness, response and recover. There is nothing "special" about insuring everyone can access mass care shelters, understand emergency information, evacuate safely or receive recovery information. Whole-community planning is something we practice as a normal course of business, because every life matters.

(*Id.*) Months before the Storm struck, Fuentes, as director of the OEM, issued the following press release, regarding Defendants' obligations to ensure that people with disabilities have equal access to emergency services:

> Our goal is inclusion of people with disabilities in emergency preparedness, and insuring access and integration of people with functional needs into all our emergency management activities. . . . Every life matters. We need to reverse the trend of people with disabilities being disproportionately impacted by disasters. We have a legal – but more importantly – an ethical obligation to do so.

(*Id.* at ¶ 21.) Plaintiff claims despite these obligations, "[b]efore, during, and after the Storm, Defendants appropriately ensured that essential components, such as shelter and care, were available to the general public," but "failed to account for Nancy and William." (*Id.* at ¶¶ 22-23.) As a result of these failures, Nancy and William Smith allegedly "sustained, and continue[] to sustain, substantial damages." (*Id.* at ¶ 24.)

The Storm made landfall in New Jersey on October 29, 2012. (*Id.* at ¶ 39.) At that time, Nancy and William Smith resided with their daughter, Deborah Smith (collectively, the "Smiths"), in their home located at 10 Jennifer Lane, Warren, New Jersey. (*Id.* at ¶ 25.) Approximately four or five days before the Storm, Deborah Smith registered Nancy and William Smith with the "Special Needs Registry" offered by New Jersey. (*Id.* at ¶ 29.) According to Plaintiff, the Special Needs Registry was "designed to help people who may have difficulty during an evacuation because of physical or cognitive limitations." (*Id.* at ¶ 28.) New Jersey "urged disabled individuals to register 'so emergency responders [could] better plan to serve them in a disaster or other emergency.'" (*Id.* at ¶ 28.) (brackets in original)

Approximately 24 to 48 hours before the Storm, Carolann Garafola, the mayor of Warren ("Garafola"), contacted Deborah Smith and informed her that because the only available shelter in the area, Stonecrest Church, was not equipped to accommodate Nancy and William Smith's

disabilities, the township, therefore, planned to place them in a nursing home, hospital, or assisted living facility for the duration of the Storm. (*Id.* at ¶¶ 33-34.) However, shortly before the Storm struck New Jersey, on October 28, 2012, Deborah Smith spoke with Jane Asch ("Asch") from the Warren Office of Emergency Management, who advised her that "she had been on a phone call with Governor Christie and it was determined that Nancy and William should stay put in their home." (*Id.* at ¶¶ 35-36.) Asch explained "that a generator would only be delivered to the home in the event the Smiths lost power." (*Id.* at ¶ 36.) "[R]elying on the assurance of Warren and Somerset that they would be provided appropriate shelter and safety during the Storm, Nancy and William forewent other opportunities to seek appropriate shelter and safety prior to the Storm's arrival." (*Id.* at ¶ 38.)

When the Storm made landfall, on October 29, 2012, the Smiths' home immediately lost power. (*Id.* at ¶ 39.) On October 29, 2012, Warren delivered a generator to the Smiths' home. (*Id.* at ¶ 40.) The generator failed immediately after delivery. (*Id.* at ¶ 41.) On October 30, 2012, Warren delivered a second generator, which also failed soon after delivery. (*Id.* at ¶¶ 42-43.) Without access to electricity, the Smiths spent "several days suffering from the bitter cold, and Nancy and William's conditions deteriorated significantly." (*Id.* at ¶¶ 44-47.)

During this period, Deborah Smith was "urgently requesting help from the local authorities." (*Id.* at ¶ 48.) In response to her calls for aid, on October 31, 2012, "a social worker from Somerset arrived at the Smiths' home." (*Id.*) Ultimately, the social worker decided to remove William Smith from the Smiths' home, "[d]espite Deborah and Nancy's vehement objections," because he "presented as a danger to himself or others," as evidenced by the fact that he "had unplugged the second generator." (*Id.*) While in the care and custody of the State,[1] William Smith

---

[1] It is not clear from the FAC specifically which Defendants had custody of William Smith.

was "involuntarily committed to three hospitals over approximately eleven days" and was allegedly "kept in substandard conditions," including residing in rooms without heat and without adequate clothing to keep him warm. (*Id.* at ¶¶ 50-53.) On November 10, 2012, William Smith passed away. (*Id.* at ¶ 54.)

Nancy and Deborah Smith remained at the Smiths' home, until November 4, 2012, without heat or electricity. (*Id.* at ¶¶ 49, 55.) On November 4, an officer from Warren's Office of Emergency Management allegedly advised Nancy and Deborah Smith that there was room for them at a shelter that had been opened at Bernard's High School in Bernardsville, New Jersey. (*Id.* at ¶ 55.) According to the officer, the shelter was accessible to the disabled and could accommodate an individual confined to a wheelchair. (*Id.*) Nancy and Deborah Smith traveled to the shelter that same day. (*Id.* at ¶ 56.) However, according to Plaintiff, the shelter "was beset with issues which made it inappropriate for Nancy and other disabled persons." (*Id.* at ¶ 57.) These alleged issues included: (i) people with disabilities were housed upstairs in the shelter, and because the elevator was not operating, these individuals were effectively trapped upstairs; (ii) the upstairs bathroom was not handicapped accessible and could not accommodate Nancy Smith's wheelchair; (iii) the upstairs area was not equipped with appropriate power outlets; and (iv) people with disabilities did not have access to a shower or hot water. (*Id.* at ¶¶ 57(A)-(K).) According to Plaintiff, "Bernard's High School was open to the general public as an emergency shelter until at least November 14, 2012" and "[d]uring that time, Bernard's High School was not equipped to accommodate disabled individuals, such as Nancy and William." (*Id.* at ¶ 58.) The FAC is silent as to how long Nancy and Deborah Smith themselves sheltered at Bernard's High School.

Plaintiff asserts that the failure of the Defendants to provide Nancy and William Smith with access to public facilities and services before, during, and in the aftermath of Superstorm

Sandy, caused significant physical, emotional, and monetary harm to them. (*Id.* at ¶ 59.) Additionally, Plaintiff alleges that "[t]o date, Defendants have failed to implement an adequate disaster relief program for disabled persons, such as Nancy." (*Id.* at ¶ 60.) Plaintiff concludes because New Jersey is susceptible to future emergencies, including both manmade and natural disasters, Nancy Smith is likely to be harmed in the future if Defendants' failures are left unaddressed. (*Id.* at ¶¶ 61-62.) Plaintiff asserts five claims against Defendants: Count One, violation of the ADA by all Defendants; Count Two, violation of § 504 of the Rehabilitation Act by all Defendants; Count Three, violation of the FHA by all Defendants; Count Four, violation of the Fourteenth Amendment, under 42 U.S.C. § 1983, by Warren and Somerset; and Count Five, violation of the NJLAD by Warren and Somerset. Plaintiff seeks damages, as well as equitable relief, including "[a] declaration that Defendants' discriminatory provision of shelter during emergencies violates" state and federal law and an order and judgment enjoining Defendants from violating state and federal law and "requiring Defendants to develop and implement an emergency preparedness program and provision of emergency shelter that addresses the unique needs of people with disabilities during emergencies[.]" (*Id.* at Counts One-Three and Five, Wherefore Clauses.)

## B.  Procedural Background

Plaintiff initially filed her Complaint in this matter on November 10, 2014. (ECF No. 1.) On July 30, 2015, the Court appointed *pro bono* counsel for Plaintiff. (ECF No. 36.) On June 16, 2016, with the consent of all defendants, Plaintiff filed the FAC, which omitted certain previously-pled defendants and included more detailed allegations regarding Plaintiff's claims. (ECF No. 47.) Somerset moves to dismiss the claims against it for failure to state a claim, pursuant to Rule 12(b)(6). (ECF No. 55.) Warren likewise moves to dismiss the claims against it for failure to state

a claim, pursuant to Rule 12(b)(6). (ECF No. 56.) State Defendants move to dismiss the claims

against them (1) pursuant to Rule 12(b)(1), for lack of subject-matter jurisdiction, on the basis of

Eleventh Amendment sovereign immunity, and (2) pursuant to Rule 12(b)(6), for failure to state a

claim. (ECF No. 57.) Plaintiff opposes these Motions.[2] (ECF Nos. 66, 67, & 79.)

## II.   LEGAL STANDARD

### A. Rule 12(b)(1)

Rule 12(b)(1) mandates the dismissal of a case for "lack of subject-matter jurisdiction."

Fed. R. Civ. P. 12(b)(1). An assertion of Eleventh Amendment immunity is a challenge to a district

court's subject-matter jurisdiction. *See Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690, 693 n.2

(3d Cir. 1996) ("[T]he Eleventh Amendment is a jurisdictional bar which deprives federal courts

of subject matter jurisdiction.") (citing *Pennhurst State School & Hosp. v. Halderman*, 465 U.S.

89, 98-100 (1984)). Typically, when jurisdiction is challenged pursuant to Rule 12(b)(1), the

plaintiff bears the burden of persuading the court that subject-matter jurisdiction exists. *Kehr*

*Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991). However, because "Eleventh

Amendment immunity can be expressly waived by a party, or forfeited through non-assertion, it

does not implicate federal subject matter jurisdiction in the ordinary sense," and therefore, a party

asserting Eleventh Amendment immunity bears the burden of proving its applicability. *Christy v.*

*Pennsylvania Turnpike Comm.*, 54 F.3d 1140, 1144 (3d Cir. 1994); *see also Carter v. City of*

*Philadelphia*, 181 F.3d 339, 347 (3d Cir. 1999).

When evaluating a Rule 12(b)(1) motion to dismiss, a court must first determine whether

the motion attacks the complaint as deficient on its face, or whether the motion attacks the

---

[2] On October 7, 2016, Plaintiff filed a letter requesting that the Court consider her sur-reply to address new arguments raised in State Defendants' reply brief. (ECF No. 79.) The Court has read and will consider Plaintiff's sur-reply in deciding the pending Motions. *See* L. Civ. R. 7.1(d)(6).

existence of subject-matter jurisdiction in fact, apart from any pleadings. *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977). If the motion consists of a facial attack, "the court must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff." *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000) (citing *Mortensen*, 549 F.2d. at 891). However, if the motion involves a factual attack, "the court may consider evidence outside the pleadings." *Gould*, 220 F.3d at 176 (citing *Gotha v. United States*, 115 F.3d 176, 178-79 (3d Cir. 1997)). Here, State Defendants' motion is a facial attack, because State Defendants assert that they are immune from Plaintiff's claims as pled. Therefore, on reviewing this question of sovereign immunity, the Court may only consider the FAC in the light most favorable to Plaintiff.

### B.  Rule 12(b)(6)

In deciding a motion to dismiss pursuant to Rule 12(b)(6), a district court is "required to accept as true all factual allegations in the complaint and draw all inferences in the facts alleged in the light most favorable to [the plaintiff]." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008). "[A] complaint attacked by a . . . motion to dismiss does not need detailed factual allegations." *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007). However, the Plaintiff's "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). A court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan*, 478 U.S. at 286. Instead, assuming the factual allegations in the complaint are true, those "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for misconduct alleged." *Id.* "Determining whether the allegations in a complaint are plausible is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* (citing Fed. R. Civ. P. 8(a)(2)).

### III.   DECISION

#### A.   Standing to Bring Claims for Prospective Injunctive Relief

Plaintiff seeks, among other remedies, equitable relief in the form of "[a]n order and judgment enjoining Defendants from violating" the ADA, the Rehabilitation Act, the FHA, and the NJLAD (as to Warren and Somerset only), "and requiring Defendants to develop and implement an emergency preparedness program that addresses the unique needs of people with disabilities during emergencies." (ECF No. 47 at ¶¶ 76, 86, 97, 114.) Defendants argue Plaintiff does not have standing to seek prospective injunctive relief, because (1) she has not plead facts indicating that Nancy Smith is in immediate threat of danger from a repetition of the type of experience that she suffered during the Storm and (2) the Estate, as an entity rather than a disabled individual, cannot be harmed by future lack of emergency services. Plaintiff does not contest that the Estate lacks standing to seek prospective injunctive relief, nor could she, but maintains that Nancy Smith has such standing, because she "faces a threat of discrimination in the provision of

emergency services that is real and immediate." (Br. in Opp'n to the Mot. to Dismiss Filed by Defs. New Jersey, OEM, Christie, and Fuentes (ECF No. 67) at 24 (quotations omitted).)

Under Article III of the Constitution, the jurisdiction of federal courts is "constitutionally restricted to 'cases' and 'controversies.'" *Flast v. Cohen*, 392 U.S. 83, 94 (1968). To have standing to sue, a plaintiff must establish "(1) an injury-in-fact that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of; and (3) a likelihood that the injury will be redressed by a favorable decision." *McNair v. Synapse Grp., Inc.*, 672 F.3d 213, 223 (3d Cir. 2012) (marks omitted). Additionally, when a plaintiff seeks prospective relief, he "must show that he is 'likely to suffer future injury from the defendant's conduct.'" *Id.* (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983)).

In *Lyons,* for example, the plaintiff brought claims against the City of Los Angeles for a Los Angeles police officer's alleged use of a chokehold on the plaintiff. 461 U.S. at 97-98. The plaintiff sought an injunction prohibiting the Los Angeles police department from using chokeholds and other control holds in situations where deadly force was not threatened. *Id.* at 98. The Supreme Court ruled that the plaintiff did not have standing to seek the requested injunction, because he had not shown that he was "likely to suffer future injury from the use of the chokeholds by police officers." *Id.* at 105. Although the plaintiff had been choked in the past, this singular event did not "establish a real and immediate threat that he would again be stopped for a traffic violation, or for any other offense, by an officer or officers who would illegally choke him into unconsciousness without any provocation or resistance on his part." *Id.* The Supreme Court further explained, "[t]he additional allegation in the complaint that the police in Los Angeles routinely apply chokeholds in situations where they are not threatened by the use of deadly force falls far

short of the allegations that would be necessary to establish a case or controversy between these parties." *Id.* at 106. The Supreme Court concluded that to establish an actual controversy in this case, the plaintiff would have had "not only to allege that he would have another encounter with the police but also to make the incredible assertion either (1) that all police officers in Los Angeles always choke any citizen with whom they happen to have an encounter, whether for the purpose of arrest, issuing a citation, or for questioning, or (2) that the City ordered or authorized police officers to act in such manner." *Id.* at 105-06.

Applying these principals to the present case, the Court finds that Nancy Smith lacks standing to seek prospective injunctive relief against Defendants. According to the FAC,

> [b]y failing to provide Nancy and William with access to public facilities and services before, during, and in the aftermath of the Storm, Defendants have caused significant physical, emotional, and monetary harm to Plaintiff. To date, Defendants have failed to implement an adequate disaster relief program for disabled persons, such as Nancy. Because New Jersey is particularly susceptible to similar disasters, the harm from Defendants' lack of an adequate disaster relief program for disabled persons is ongoing and must be addressed immediately before the next natural disaster inevitably strikes. If Defendants' failures are left unaddressed, Nancy is likely to be harmed in the future when another natural disaster or emergency strikes New Jersey.

(ECF No. 47 at ¶¶ 59-62.) It is likely the County of Somerset will experience another natural disaster or emergency, however major or minor, at some point in the future. *See Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg*, 290 F.R.D. 409, 415 (S.D.N.Y. 2012) ("It is, of course, not possible to know with certainty if or when disaster will strike the City, but — as the tragic events of the past few weeks make abundantly clear — it is beyond 'mere conjecture' that another disaster, whether natural or manmade, will occur . . . ."). However, Plaintiff has failed show that when such a disaster strikes, Nancy Smith faces a real and immediate threat of discrimination in

Defendants' future provision of emergency services to her, because she has not plead facts indicating that the violations alleged in the FAC will likely be repeated.

First, Plaintiff does not assert, nor could she, that it is the official policy of Defendants to discriminate against people with disabilities when providing emergency services. To the contrary, according to the FAC, State Defendants have publicly acknowledged that individuals with disabilities are disproportionately impacted by disasters, and have expressed intent to ensure that everyone has sufficient access to emergency services, regardless of their disabilities. (ECF No. 47 at ¶¶ 19-22.) Instead, Plaintiff claims "[t]o date, Defendants have failed to implement an adequate disaster relief program for disabled persons, such as Nancy." (*Id.* at ¶ 60.) However, the Complaint contains no facts indicating that Defendants have not revised their emergency procedures since the Storm to sufficiently provide services to disabled individuals. To the contrary, the facts alleged indicate that prior to and during the Storm, Defendants were actively attempting to improve access to their emergency services for disabled individuals.

For example, according to the FAC, "Warren had utilized Stonecrest Church on five prior occasions before the Storm" to provide emergency shelter for its residents, but "[o]n each such occasion, Stonecrest Church could not accommodate disabled persons." (*Id.* at ¶ 33.) However, during the Storm, rather than attempt to again utilize Stonecrest Church to provide Nancy and William Smith with shelter, Warren, Somerset, and the OEM attempted to administer emergency aid to them at their home. (*Id.* at ¶¶ 33-47.) Indeed, Garafola even explained that Warren wanted to provide William and Nancy Smith with alternative emergency services because Stonecrest Church was not sufficiently accessible. (*Id.* at ¶¶ 33-34.) Such allegations indicate that Defendants were actively seeking to accommodate Nancy and William Smith's needs. Therefore, it appears

13

unlikely that at the advent of the next emergency, Defendants will implement the same programs that allegedly failed the Smiths so completely during the Storm.

Furthermore, under the facts alleged, the Storm appears to have been such a unique, large-scale event that it overwhelmed Defendants' normal emergency services infrastructure in a way that may never reoccur. Thus, Plaintiff has not demonstrated, as she asserts, that "Nancy is highly likely, if not absolutely certain, to suffer discrimination any time any emergency or disaster strikes [her] geographic area." (ECF No. 67 at 25.)

In sum, although it appears likely that at some point in the future the County of Somerset may experience another natural disaster or emergency, Plaintiff has not sufficiently alleged that when that disaster strikes Defendants are likely to again fail to provide her with sufficient access to emergency services. Accordingly, Nancy Smith's claims for prospective injunctive relief are dismissed without prejudice and the Estate's claims for prospective injunctive relief are dismissed with prejudice.

## B.  Eleventh Amendment Immunity

Plaintiff brings claims against State Defendants under the ADA, the Rehabilitation Act, and the FHA. State Defendants move to dismiss the ADA and FHA claims against them, arguing that they are barred by Eleventh Amendment sovereign immunity.[3] Plaintiff concedes that the Eleventh Amendment bars FHA claims against State Defendants, with the exception of claims for

---

[3] State Defendants do not move to dismiss Plaintiff's Rehabilitation Act claims on the basis of sovereign immunity, because they concede New Jersey has waived its immunity from such claims by accepting federal funds. (Br. in Supp. of Defs.' Mot. to Dismiss (ECF No. 75) at 2 n.1); s*ee also Koslow v. Pennsylvania*, 302 F.3d 161, 170 (3d Cir. 2002) ("[B]y accepting federal funds under the Rehabilitation Act, [states] waive their Eleventh Amendment immunity to Rehabilitation Act claims."). Nonetheless, as discussed *infra*, State Defendants assert that the Rehabilitation Act claims against them should also be dismissed, because Plaintiff has failed to state a claim upon which relief may be granted.

prospective injunctive relief against Fuentes and Christie.[4] (ECF No. 67 at 2 n.2.) However, due to lack of standing, the Estate's claims for prospective injunctive relief are dismissed with prejudice and Nancy Smith's claims for prospective injunctive relief are dismissed without prejudice. Therefore, Nancy Smith's FHA claims against Christie and Fuentes are dismissed without prejudice insofar as they seek prospective injunctive relief, and all her remaining FHA claims against State Defendants are dismissed with prejudice. The Estate's FHA claims against State Defendants are dismissed with prejudice in their entirety.

Regarding the ADA claims against State Defendants, Plaintiff asserts, under the doctrine of constitutional avoidance, that the Court should decline to reach the question of whether such claims are barred by State Defendants' Eleventh Amendment sovereign immunity. According to Plaintiff, because State Defendants concede that they have waived their rights to sovereign immunity under the Rehabilitation Act, a statute that provides coextensive rights and remedies with the ADA, the Court need not determine whether Plaintiff's ADA claims are barred by sovereign immunity until the Rehabilitation Act claims are dismissed. State Defendants counter that the Court should reach the question of whether they have immunity from Plaintiff's ADA claims, because these claims are not coextensive with Plaintiff's Rehabilitation Act claims. Plaintiff further asserts that in the event the Court reaches the question of whether the ADA claims are barred by Eleventh Amendment immunity, the Court should find that the ADA abrogates State Defendants' sovereign immunity with regard to Plaintiff's claims. For the reasons set forth below, the Court finds that Plaintiff has stated a claim against State Defendants under both the

---

[4]Where claims against a non-consenting state are barred by the Eleventh Amendment, a party can sue a state official under *Ex parte Young*, 209 U.S. 123 (1908) for prospective injunctive relief from ongoing violations of a federal law or the Constitution. *Koslow*, 302 F.3d at 179.

Rehabilitation Act and the ADA, and reserves decision on the question of whether sovereign immunity bars Plaintiff's ADA claims against State Defendants.

"That a State may not be sued without its consent is a fundamental rule of jurisprudence." *Pennhurst*, 465 U.S. at 98, (1984) (quoting *Ex parte State of New York*, 256 U.S. 490, 497 (1921)). This protection is afforded by the Eleventh Amendment, which provides that "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign state." U.S. Const. amend. XI. States and state agencies are immune from suits in federal court brought by their own citizens, or citizens of other states, regardless of the relief sought. *Pennhurst*, 465 U.S. at 100-01; *see also Thorpe v. New Jersey*, 246 F. App'x 86, 87 (3d Cir. 2007) ("The Eleventh Amendment of the U.S. Constitution protects a state or state agency from a suit brought in federal court by one of its own citizens regardless of the relief sought . . . ."). New Jersey, as "one of the United States," enjoys the benefits of Eleventh Amendment sovereign immunity.

The Eleventh Amendment also provides sovereign immunity to agencies, departments, and officials of the state when the state is the real party in interest in the suit. *Alabama v. Pugh*, 438 U.S. 781, 781 (1978); *Pa. Fedn. of Sportsmen's Clubs, Inc. v. Hess*, 297 F.3d 310, 323 (3d. Cir. 2002); *Chisolm v. McManimon*, 275 F.3d 315, 323 (3d Cir. 2001). The state is a real party in interest when "the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration, or if the effect of the judgment would be to restrain the Government from acting or to compel it to act." *Fitchik v. New Jersey Transit Rail Operations, Inc.*, 873 F.2d 655, 659 (3d. Cir. 1989). "In short, sovereign immunity is appropriate if the named defendant is an arm of the state." *Love v. N.J. State Police*, Civ. No. 14-1313 (FLW)(TJB), 2016

U.S. Dist. LEXIS 69562, at *24-25 (D.N.J. May 26, 2016) (quotations omitted); *see also Chisolm*, 275 F. 3d at 323. State officials in their official capacities are also immune from suit, "because it is merely another way of pleading an action against the state." *Shahin v. Delaware*, 563 F. App'x 196, 198 (3d Cir. 2014); *see also Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70-71 (1989). The parties do not dispute, nor could they, that the OEM, Christie, in his official capacity as the Governor of the State of New Jersey, and Fuentes, in his official capacity as the New Jersey Director of Emergency Management, all qualify as "arms of the state" for the purposes of sovereign immunity.[5]

There are only three narrowly circumscribed exceptions that have been established to limit the breadth of the Eleventh Amendment: "1) congressional abrogation, 2) state waiver, and 3) suits against individual state officers for prospective relief to end an ongoing violation of federal law." *MCI Telecomm. Corp. v. Bell Atlantic-Pennsylvania*, 271 F.3d 491, 503 (3d Cir. 2001). At issue here is whether the ADA validly abrogates State Defendants' sovereign immunity from Plaintiff's claims.

"In order for Congress to validly abrogate state sovereign immunity, Congress must: (1) unequivocally express its intent to abrogate that immunity; and (2) act pursuant to a valid grant of constitutional authority." *Bowers v. NCAA*, 475 F.3d 524, 550 (3d Cir. 2007). Here, the first prong of this test is satisfied by language in the ADA which expressly dictates that "[a] State shall not be

---

[5] The OEM is controlled by the New Jersey State Police, which has been found by courts in this district to be an "arm of the state" for the purposes of Eleventh Amendment immunity. *See* New Jersey Governor Brendan Byrne's Executive Order No. 101 (December 17, 1980) ("[T]here is hereby established an Office of Emergency Management in the Division of State Police, Department of Law and Public Safety."); *Lassoff v. New Jersey*, 414 F. Supp. 2d 483, 489 (D.N.J. 2006) (finding the New Jersey State Police entitled to Eleventh Amendment immunity as an arm of the state); *Simmerman v. Corino*, 804 F. Supp. 644, 650 (D.N.J. 1992) (same); *Canales v. Twp. of Toms River*, Civ. No. 11-3159 (MLC), 2014 U.S. Dist. LEXIS 21086, at *42 (D.N.J. Feb. 20, 2014) (same).

immune under the eleventh amendment to the Constitution of the United States from an action in [a] Federal or State court of competent jurisdiction for a violation of this Act." 42 U.S.C. § 12202; *see Bowers*, 475 F.3d at 550. Regarding the second prong of this test, "[i]n enacting the ADA Congress 'invoke[d] the sweep of congressional authority, including the power to enforce the fourteenth amendment.'" *United States v. Georgia*, 546 U.S. 151, 154 (2006) (quoting 42 U.S.C. § 12101(b)(4)). Under § 5 of the Fourteenth Amendment, Congress has broad powers to abrogate states' sovereign immunity for the purpose of enforcing the substantive guarantees of that Amendment. *Bowers*, 475 F.3d at 550-51. Among these broad powers is the right to "'enforce . . . the provisions' of the [Fourteenth] Amendment by creating private remedies against the States for actual violations of those provisions." *Georgia*, 546 U.S. at 158.

However, congressional power to enforce the Fourteenth Amendment is limited in that it must exhibit "a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *Bowers*, 475 F.3d at 551 (quoting *Tennessee v. Lane*, 541 U.S. 509, 520 (2004)). Essentially, Congress does not have the power to "decree the substance of the Fourteenth Amendment's restrictions on States." *City of Boerne v. Flores*, 521 U.S. 507, 519 (1997). As the Supreme Court has explained:

> Legislation which alters the meaning of the Free Exercise Clause cannot be said to be enforcing the Clause. Congress does not enforce a constitutional right by changing what the right is. It has been given the power "to enforce," not the power to determine what constitutes a constitutional violation. Were it not so, what Congress would be enforcing would no longer be, in any meaningful sense, the "provisions of [the Fourteenth Amendment]."

*Id.* (brackets in original). Therefore, the ADA only validly abrogates state sovereign immunity, "insofar as [it] creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment." *Georgia*, 546 U.S. at 159 (emphasis in original).

Whether the ADA validly abrogates a defendant's Eleventh Amendment immunity must be determined on a "claim-by-claim basis." *Id*. This inquiry requires district courts to analyze

> (1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II [of the ADA] but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid.

*Id*. District courts "do not reach the constitutional issue[, however,] unless and until it is decided that the plaintiff has made out a valid Title II claim." *Baxter v. Pa. Dep't of Corr.*, Civ. No. 16-1838, 2016 U.S. App. LEXIS 17705, at *6 (3d Cir. Sep. 30, 2016).

### i.    Violation of the ADA

First, the Court determines which aspects of State Defendants' alleged conduct violated the ADA. Under Title II of the ADA, "[n]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. A "qualified individual with a disability" is defined as:

> an individual with a disability who, with or without reasonable modification to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

42 U.S.C. § 12131(2). Thus,

> [t]o establish a violation of Title II of the ADA, a plaintiff must allege that: (1) he is a qualified individual with a disability; (2) he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability.

*Muhammad v. Court of Common Pleas*, 483 F. App'x 759, 762 (3d Cir. 2012).

According to the FAC, William Smith was a disabled individual within the meaning of the ADA, because he suffered from dementia and Alzheimer's disease. (ECF No. 47 at ¶ 3.) Nancy Smith is disabled within the meaning of the ADA, because she suffers Parkinson's disease and is confined to a wheelchair. (*Id.* at ¶¶ 2, 57.) Plaintiff alleges, generally, that "Defendants provide an aid, benefit, or service in the form of an emergency preparedness program." (*Id.* at ¶ 72.) According to the Complaint, Defendants provided their emergency preparedness program "in an unequal manner that denied or limited Nancy and William's ability to enjoy the benefits as non-disabled persons could." (*Id.*) Specifically, Plaintiff alleges that the Stonecrest Church shelter in Warren was open to the general public, but was "not equipped to accommodate William and Nancy due to their disabilities." (*Id.* at ¶ 33.) Similarly, the Bernard's High School shelter in Bernardsville was open to the general public, but was unable to accommodate Nancy Smith's wheelchair. (*Id.* at ¶ 57.) Plaintiff asserts that State Defendants were responsible for the administration of these two shelters, because "[t]he OEM, on behalf of Governor Christie, coordinates, directs, and controls all emergency management activities throughout the State." (*Id.* at ¶ 8.) Taking the facts pled as true, State Defendants' alleged conduct violated the ADA because (1) William and Nancy Smith were individuals with disabilities who were qualified to receive benefits offered by State Defendants, i.e. shelter at Stonecrest Church or Bernard's High School, but (2) they were excluded from use of these shelters, because (3) their disabilities rendered the shelters inaccessible to them.

### ii.    Constitutional Avoidance

Because Plaintiff has successfully stated ADA claims against State Defendants, the Court next turns to whether the doctrine of constitutional avoidance requires the Court to reserve its decision as to whether the ADA validly abrogates State Defendants' sovereign immunity from these claims. "A fundamental and long-standing principle of judicial restraint requires that courts

avoid reaching constitutional questions in advance of the necessity of deciding them." *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988). Plaintiff argues that because State Defendants have waived their sovereign immunity under the Rehabilitation Act and because "the Rehabilitation Act and the ADA are virtually identical, and provide coextensive rights and remedies," it is not necessary, at this early stage of the litigation, to decide the abrogation issue. (ECF No. 67 at 11.) Plaintiff therefore asserts judicial restraint militates reserving this decision until the point at which the rights and remedies available under Plaintiff's ADA claims are no longer coextensive with those available under Plaintiff's Rehabilitation Act claims.

"[T]he substantive standards for determining liability under the Rehabilitation Act and the ADA are the same." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 275 (3d Cir. 2014) (citing *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 283 (3d Cir. 2012)). Indeed, the ADA expressly incorporates the standards of the Rehabilitation Act, stating that "[t]he remedies, procedures, and rights set forth in section 505 of the Rehabilitation Act . . . shall be the remedies, procedures, and rights" provided to any person alleging discrimination on the basis of disability under Title II of the ADA. 42 U.S.C. § 12133; *see also Blunt*, 767 F.3d at 316. The only material difference between a claim under Title II of the ADA and a claim under § 504 of the Rehabilitation Act is the causation element.[6] *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 300 n.4 (3d Cir. 2007) ("[D]espite the fact that Congress has directed the courts to construe the ADA and the Rehabilitation Act such that conflicting standards do not arise, the ADA and the Rehabilitation Act are not exactly the same. The language of these two statutory provisions regarding the

---

[6] A claim under § 504 of the Rehabilitation Act also requires a showing "that the program or activity in question receives federal financial assistance." *Wagner v. Fair Acres Geriatric Ctr.*, 49 F.3d 1002, 1009 (3d Cir. 1995). However, this element is not at issue here, because State Defendants concede that they "receive federal funding in relation to emergency responses." (ECF No. 75 at 2 n.1.)

causative link between discrimination and adverse action is significantly dissimilar.") (marks and citations omitted). Under the Rehabilitation Act, to bring a claim, a qualified individual must have been excluded from or denied benefits *solely* by reason of her disability. 29 U.S.C. § 794(a); *Id.* By contrast, under the ADA, discrimination need not be the sole reason for the exclusion or denial of benefits; the statute "requires only but for causation." *New Directions*, 490 F.3d at 300 n.4.

State Defendants argue that Plaintiff has failed to plead the causation element of a Rehabilitation Act claim. If State Defendants are correct, Plaintiff's constitutional avoidance argument would be rendered moot, because Plaintiff's Rehabilitation Act claims must be dismissed and thus cannot provide the same remedies Plaintiff seeks through her ADA claims. However, State Defendants misapply the Rehabilitation Act's causation standard. State Defendants assert that Plaintiff has not met the causation requirements of the Rehabilitation Act because "the Amended Complaint is completely devoid of any factual allegations that the State Defendants denied any benefits to Plaintiffs due to discrimination based solely on their disabilities." (ECF No. 57-1 at 23.) According to State Defendants, "there is virtually an endless amount of factors and considerations that public officials need to account for during an emergency, and none of Plaintiffs' allegations tend to show that any State Defendant or State employee was motivated 'solely' by the disabilities of Plaintiffs rather than any other possible motivation." (*Id.* at 25-26.)

However, a plaintiff bringing a Rehabilitation Act claim need not allege that her disability was the sole *motivation* for the policy or action that ultimately excluded her from receiving benefits. Indeed, discriminatory motive is not a necessary element of a Rehabilitation Act claim.[7]

---

[7] Separate from the elements of a Rehabilitation Act or ADA claim, the Third Circuit has found that to pursue compensatory damages under these statutes, a plaintiff must show intentional discrimination. *S.H. v. Lower Merion Sch. Dist.*, 729 F.3d 248, 261 (3d Cir. 2013). However, even this heightened standard does not require a showing that the defendant's *sole* intent was to

*Nathanson v. Med. Coll. of Pa.*, 926 F.2d 1368, 1384 (3d Cir. 1991) (finding that a plaintiff need not establish that there has been an intent to discriminate in order to prevail under § 504). Even a facially neutral policy may violate the Rehabilitation Act, if the agency instituting that policy fails to make a "reasonable accommodation to the 'known physical or mental limitations' of otherwise qualified individuals." *Id.* Therefore, contrary to State Defendants' assertions, Plaintiff need not allege that Nancy and William Smith's exclusion from full use of the Stonecrest Church shelter and Bernard's High School shelter was a result of conduct by State Defendants that was solely *motivated* by discriminatory animus towards Nancy and William Smith's disabilities. Rather, Plaintiff may satisfy the causation element of the Rehabilitation Act by alleging that William and Mary Smith were excluded from full use of these shelters because they were unable to access and/or utilize them solely due to their respective disabilities. For these reasons, the Court finds that Plaintiff has successfully plead claims under both the ADA and the Rehabilitation Act against State Defendants on behalf of both Nancy Smith and the Estate.

Furthermore, to the extent that State Defendants argue that possible facts in this case "could theoretically give rise to liability under the ADA but not the Rehabilitation Act" (ECF No. 75 at 3), this argument is premature. On a motion to dismiss, courts do not consider "potential" or "theoretical" facts proposed by the defendant. *See In re Burlington Coat Factory Sec. Litig.*, 114

---

discriminate against the plaintiff on the basis of her disability. Indeed, a showing of deliberate indifference to the plaintiff's disability is sufficient to satisfy this standard. *Id.* at 264.

As the Supreme Court has explained, when Congress enacted the Rehabilitation Act and the ADA, "[d]iscrimination against the handicapped was perceived by Congress to be most often the product, not of invidious animus, but rather of thoughtlessness and indifference — of benign neglect." *Alexander v. Choate*, 469 U.S. 287, 295 (1985). "Consistent with these motivations, the [Rehabilitation Act] and the ADA are targeted to address more subtle forms of discrimination than merely obviously exclusionary conduct." *S.H.*, 729 F.3d at 264 (quotations omitted). Consequently, for the purposes of a Rehabilitation Act claim or ADA claim, "deliberate indifference is a *form* of intentional discrimination." *Blunt*, 767 F.3d at 316 (emphasis in original).

F.3d 1410, 1426 (3d Cir. 1997) ("As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings."). Instead, with few exceptions, courts' analyses are limited to the facts alleged in the complaint. *Id.* On these Motions to Dismiss, this Court considers only the allegations in the FAC and finds Plaintiff has sufficiently alleged both ADA and Rehabilitation Act claims against State Defendants. State Defendants' Motion to Dismiss is therefore denied insofar as it seeks to dismiss Plaintiff's Rehabilitation Act claims for failure to state a claim.

Accordingly, because Plaintiff's rights and remedies under both the ADA claims and the Rehabilitation Act claims are currently coextensive, the Court finds that the doctrine of constitutional avoidance militates reserving a decision on whether Congress has validly abrogated State Defendants' sovereign immunity to Plaintiff's ADA claims. *See Bennett-Nelson v. Louisiana Bd. of Regents*, 431 F.3d 448, 455 (5th Cir. 2005) ("[H]aving already held that sovereign immunity does not bar the appellants' claim under § 504, we need not address at this juncture the issue of abrogation under Title II of the ADA, because the rights and remedies under either are the same for purposes of this case."). In that regard, the Court is persuaded that the discovery process for the pending ADA claims will be virtually identical to the discovery process for the pending Rehabilitation claims. Furthermore, discovery may yet reveal some deficiency in Plaintiff's ADA claims that will require the dismissal of these claims without necessitating a decision of the constitutional question. The Court therefore reserves judgment on this issue until it is "squarely presented" to the Court. *See Bowers*, 475 F.3d at 550 (finding ADA abrogation question "squarely presented" to court on motion for summary judgment). State Defendants' Motion to Dismiss Plaintiff's ADA claims on Eleventh Amendment immunity grounds is denied without prejudice.

### C.  Statutes of Limitations

Both Warren and Somerset argue that Plaintiff's claims against them should be dismissed as time-barred under the applicable statute of limitations. Typically, "the Federal Rules of Civil Procedure require a defendant to plead an affirmative defense, like a statute of limitations defense, in the answer, not in a motion to dismiss." *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014). However, in this circuit, a defendant may succeed on a motion to dismiss on the basis of statute of limitations, "if the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations." *Id.* (quoting *Robinson v. Johnson*, 313 F.3d 128, 134-35 (3d Cir. 2002)) (quotations omitted).

The parties agree that the relevant statutes of limitations as to all of Plaintiff's claims is two years. Claims under the FHA are governed by a two-year statute of limitations. 42 U.S.C. § 3613. The ADA, the Rehabilitation Act, and § 1983 do not contain their own statutes of limitations, meaning courts must apply the most appropriate or analogous state statute of limitations. *See Dique v. N.J. State Police*, 603 F.3d 181, 185 (3d Cir. 2010) ("state law provides the statute of limitations applicable to a section 1983 claim"); *Disabled in Action v. SEPTA*, 539 F.3d 199, 208 (3d Cir. 2008) ("Neither Title II of the ADA nor Section 504 of the [Rehabilitation Act] includes an express statute of limitations. As both statutes were enacted prior to the effective date of the default four-year statute of limitations for federal statutes, *see* 28 U.S.C. § 1658, we borrow the statute of limitations of the most analogous state law cause of action."). Claims under these statutes are governed by the forum state statute of limitations for personal injury claims. *See Dique*, 603 F.3d at 185 ("A section 1983 claim is characterized as a personal-injury claim and thus is governed by the applicable state's statute of limitations for personal-injury claims."); *Disabled in Action*, 539 F.3d at 208 (applying forum state statute of limitations for personal injury claims to Title II of the ADA & § 504 Rehabilitation Act claims). In New Jersey, personal injury claims

are subject to a two-year statute of limitations. N.J.S.A. 2A:14-2(a). Similarly, claims under the

NJLAD are also subject to a two-year statute of limitations. *Alexander v. Seton Hall Univ.*, 204

N.J. 219, 228 (2010). Therefore, because Plaintiff brought her Complaint on November 10, 2014,

if any of her claims accrued prior to November 10, 2012, they will be barred by the applicable

statutes of limitations.

### i.   Date of Accrual

Federal law governs a federal cause of action's accrual date. *Kach v. Hose*, 589 F.3d 626,

634 (3d Cir. 2009). Additionally, "[t]he New Jersey Supreme Court has adopted the federal

framework for determining when an NJLAD claim accrues." *Serrano v. Marcal Paper Mills, LLC*,

Civ. No. 11-03501 (SDW), 2012 U.S. Dist. LEXIS 10742, at *11 (D.N.J. Jan. 30, 2012) (citing

*Roa v. Roa*, 200 N.J. 555, 568 (2010)). Under federal law, a claim accrues when the facts which

support the claim reasonably should have become known to the plaintiff. *Sameric Corp. v. City of

Phila.*, 142 F.3d 582, 599 (3d Cir. 1998); *Cetel v. Kirwan Fin. Grp., Inc.*, 460 F.3d 494, 507 (3d

Cir. 2006) (quoting *Mathews v. Kidder Peabody & Co.*, 260 F.3d 239, 252 (3d Cir. 2001)); *see

also Large v. County of Montgomery*, 307 F. App'x 606, 606 (3d Cir. 2009). "The determination

of the time at which a claim accrues is an objective inquiry; [courts] ask not what the plaintiff

actually knew but what a reasonable person should have known." *Kach*, 589 F.3d at 634.

Importantly, accrual is not tied to whether the potential claimant knew or should have known that

the injury constitutes a legal wrong. *Giles v. City of Philadelphia*, 542 F. App'x 121, 123 (3d Cir.

2013) (citing *Sandutch v. Muroski*, 684 F.2d 252, 254 (3d Cir.1982)). Rather, "a cause of action

accrues when the fact of injury and its connection to the defendant would be recognized by a

reasonable person." *Kriss v. Fayette County*, 827 F. Supp. 2d 477, 484 (W.D. Pa. 2011) *aff'd*, 504

F. App'x 182 (3d Cir. 2012). Accordingly, "[a]s a general matter, a cause of action accrues at the

time of the last event necessary to complete the tort, usually at the time the plaintiff suffers an injury."[8] *Kach*, 589 F.3d at 634.

Here, under the facts alleged, almost all of Plaintiff's claims accrued more than two years before Plaintiff filed the Complaint. The Storm made landfall in New Jersey on October 29, 2012. (ECF No. 47 at ¶ 39.) According to the FAC, on October 29, 2012, and again on October 30, 2012, Warren delivered generators to the Smith's home that failed almost immediately after delivery. (*Id.* at ¶¶ 40-46.) Plaintiff alleges that the resulting "bitter cold" almost immediately caused Nancy and William Smith's conditions to deteriorate significantly. (*Id.* at ¶¶ 46-47.) As such, under the facts alleged, once Nancy and William Smith began to suffer the effects of the cold, they should have reasonably recognized the fact of their injury and its connection to Defendants. To that point, according to the FAC, Deborah Smith spent the period between October 29, 2012 and October 31, 2012 "urgently requesting help from the local authorities" on behalf of Nancy and William Smith. (*Id.* at ¶ 48.) Therefore, any claims arising from Defendants' alleged failure to provide Nancy and William Smith with adequate shelter during the storm accrued on October 29, 2012 or October 30, 2012, because on those dates Defendants' alleged failure to provide Nancy and William Smith with adequate shelter first caused them injury. Accordingly, claims arising from such allegations fall outside the statute of limitations.

---

[8] Plaintiff argues that because her claims arise from Defendants' failure to properly ensure individuals with disabilities were provided equal access to emergency services during the Storm, her claims did not accrue until November 14, 2012, the last date the Bernard's High School shelter remained open to the general public. However, Defendants' continued provision of services to the public at large did not bar Plaintiff from bringing the claims she asserts in this action. In that regard, Nancy or William could have brought any of their claims the moment they suffered an injury. As such, Nancy and William's claims accrued "when the fact of [their] injury and its connection to the defendant would be recognized by a reasonable person." *See Kriss*, 827 F. Supp. 2d at 484.

On October 31, 2012, William Smith was involuntarily committed to a hospital by a social worker employed by Somerset. (*Id.* at ¶¶ 48-50.) Since the injury from his involuntary committal was inherently obvious and occurred immediately upon being taken into custody, any claims arising from his involuntary committal, accrued on October 31, 2012 and are outside the statute of limitations.

From October 31, 2012 through November 10, 2012, William Smith was allegedly kept in "substandard conditions" while in the custody of the State. (*Id.* at ¶¶ 50-53.) The FAC does not specify exactly how or when William Smith was injured by these conditions. Therefore, it is unclear from these allegations when William Smith, or Plaintiff as the executor of the Estate after William Smith's death, reasonably should have known of his injuries and their connection to Defendants. Accordingly, because it is not clear on the face of the FAC when the Estate's claims related to William Smith's alleged mistreatment while in State custody accrued, such claims cannot be dismissed as time-barred on this Motion to Dismiss.

Finally, Plaintiff alleges that on November 4, 2012, at the direction of an officer from Warren's Office of Emergency Management, Nancy and Deborah Smith relocated to the Bernard's High School shelter. (*Id.* at ¶¶ 54-56.) According to Plaintiff, the shelter did not adequately accommodate the needs of individuals with disabilities.[9] (*Id.* at ¶ 57.) It is not clear how long Plaintiff remained at the Bernard's High School shelter, however, the FAC alleges that the shelter was open to the public until November 14, 2012. (*Id.* at ¶ 58.) Furthermore, it is not clear on the face of the FAC when, during the course of her stay at the Bernard's High School shelter, Nancy

---

[9] Warren asserts that it was not responsible for the Bernard's High School shelter and therefore cannot be liable for any of its shortcomings. However, Plaintiff alleges that it was an officer of Warren's Office of Emergency Management that directed her to the shelter. Accordingly, taking all allegations as true, the Court cannot conclude on this Motion to Dismiss that Warren was not an entity responsible for the administration of the Bernard's High School shelter.

Smith should have become reasonably aware of her injuries due to the alleged short-comings of the shelter. Some of the alleged problems with the shelter would have been immediately apparent on arrival. For example, according to the FAC,

> Nancy and other disabled persons were housed upstairs, while nondisabled individuals were kept downstairs. The elevator was not functioning, and the high school was not equipped with appropriate ramps. As a result, disabled individuals faced difficulty making it upstairs, and when they finally did make it upstairs, they were effectively trapped on the second floor.

(*Id.* at ¶¶ 57(A)-(B).) However, other of the shelter's alleged defects may not have been reasonably discovered by Nancy Smith until after November 10, 2012. For example, at some point during Nancy Smith's stay "the women's bathroom on the second floor broke down, the female disabled persons were compelled to use the men's room on the second floor." (*Id.* at ¶ 57(C).) Additionally, it is not clear on the face of the FAC when Nancy Smith should have reasonably discovered that unlike the downstairs bathroom, the upstairs bathroom used by the residents with disabilities "did not have a shower" and "did not [provide] access to hot water." (*Id.* at ¶¶ 57(E)-(G).) As such, under the facts alleged, Nancy Smith's claims arising from the inadequate accommodations at the Bernard's High School may have accrued after November 10, 2012. Consequently, these claims cannot be dismissed as time-barred on this Motion to Dismiss.

In sum, the Estate's claims arising from Defendants' alleged failure to provide William Smith with adequate access to emergency services while he sheltered at his home, between October 29, 2012 and October 31, 2012, clearly accrued outside the applicable statues of limitations. Likewise, under the facts alleged, the Estate's claims related to William Smith's involuntary commitment on October 31, 2012 is clearly time-barred. However, it is not apparent from the face of the FAC when the Estate's claims arising from the alleged mistreatment of William Smith while in State custody accrued. Similarly, Nancy Smith's claims arising from Defendants' alleged failure

to provide her with adequate access to emergency services while she sheltered at her home, between October 29, 2012 and November 4, 2012, clearly accrued outside the statute of limitations. However, under the facts pled, Nancy Smith's claims arising from the alleged failure of the Bernard's High School shelter to adequately accommodate residents with disabilities may have accrued within the applicable statutes of limitations.

Plaintiff argues that her claims seeking relief for violations occurring before November 10, 2014 are timely, nonetheless, based on the continuing violations doctrine. "The continuing violations doctrine is most often applied in employment discrimination cases and is an 'equitable exception to the timely filing requirement.'" *Bennett v. Susquehanna Cty. Children & Youth Servs.*, 592 F. App'x 81, 84 (3d Cir. 2014) (quoting *Cowell v. Palmer Twp.*, 263 F.3d 286, 292 (3d Cir. 2001)). "The continuing violations doctrine is an equitable exception to a strict application of a statute of limitations where the conduct complained of consists of a pattern that has only become cognizable as illegal over time." *Foster v. Morris*, 208 F. App'x 174, 177 (3d Cir. 2006) (*Cowell*, 263 F.3d at 292). "When a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period; in such an instance, the court will grant relief for the earlier related acts that would otherwise be time barred." *Foster*, 208 F. App'x at 177-78 (quoting *Brenner v. United Bhd. of Carpenters & Joiners*, 927 F.2d 1283, 1295 (3d Cir.1991) (marks omitted). "Courts consider two factors in determining whether to apply the continuing violations doctrine: (1) whether the violations were related in subject matter and (2) whether the acts were recurring." [10] *Bennett*, 592 F. App'x at 84 (citing *Cowell*, 263 F.3d at 292 and *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 166 (3d Cir. 2013)).

---

[10] The Court notes that Plaintiff cites to *Cowell*, 263 F.3d 286, which sets forth a three-factor continuing violation test, with the third factor requiring a showing of permanency. "However,

However, the Third Circuit has cautioned "the continuing violations doctrine is not a substitute for a plaintiff's 'awareness of and duty to assert his/her rights' in a timely fashion." *Bennett*, 592 F. App'x at 85 (quoting *Cowell*, 263 F.3d at 295). As such, "the doctrine 'does not apply when plaintiffs are aware of the injury at the time it occurred.'" *Bennett*, 592 F. App'x at 85 (quoting *Morganroth & Morganroth v. Norris, McLaughlin & Marcus*, P.C., 331 F.3d 406, 417 n.6 (3d Cir. 2003)); *see also Muhammad*, 483 F. App'x at 762 ("The District Court correctly reasoned that . . . the continuing violations doctrine did not apply because [the plaintiff] should have been aware of each act's negative impact at the time it occurred."); *Zied v. Barnhart*, 418 F. App'x 109, 114 (3d Cir. 2011) ("[A]s explained by the District Court, the continuing violations doctrine for extending a statute of limitation does not apply to injuries that occurred before the filing period if the plaintiff was aware, as Zied was, of those injuries at the time they occurred."). Here, the continuing violation doctrine does not apply to Plaintiff's time-barred claims, because under the facts alleged, Nancy and William Smith should have been aware of the negative impact of each of these alleged violations at the time they occurred.[11] Therefore, on the face of the FAC, claims arising from the following alleged violations accrued outside the applicable statutes of limitations: (1) failure to provide William Smith with adequate access to emergency services while he sheltered at his home; (2) failure to provide Nancy Smith with adequate access to emergency services while she sheltered at her home; and (3) William Smith's involuntary commitment. It is

---

under *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 166 (3d Cir. 2013), there is no longer a permanency requirement under the continuing violations doctrine." *Bennett*, 592 F. App'x at 84 n.3.

[11] It remains a question of fact as to when Plaintiff's remaining claims accrued and whether Nancy or William should have been aware of the negative impact of each of these alleged violations at the time they occurred. Therefore, the Court makes no finding as to whether the continuing violations doctrine applies to the Estate's claims arising from William's alleged mistreatment while in the custody of the State, or Nancy's claims arising from the alleged shortcomings of the Bernard's High School shelter.

unclear, based on the pleadings, whether the remaining claims are timely. As such, taking the allegations in the light most favorable to Plaintiff, the Motions to Dismiss these claims as time-barred are denied.

### ii. Equitable Tolling

Once a defendant has successfully raised a statute of limitations defense to a claim, generally, it is the plaintiff's burden to show that the statute of limitations should be equitably tolled. *Schmidt*, 770 F.3d at 251; s*ee also Credit Suisse Sec. (USA) LLC v. Simmonds*, 132 S. Ct. 1414, 1419 (2012). "At the motion to dismiss stage, a plaintiff who seeks to invoke equitable tolling need only 'plead the applicability of the doctrine.'"[12] *Perelman v. Perelman*, 545 F. App'x 142, 151 (3d Cir. 2013) (quoting *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1391 (3d Cir. 1994)). Here, Plaintiff argues that the Estate's time-barred claims should be equitably tolled until November 10, 2012, the date of William Smith's death, because his mental disability prevented him from understanding his legal rights and commencing a legal action.

Federal tolling principals apply to federal statutes of limitation, while state tolling principals apply to state statutes of limitation, unless such state tolling principals are inconsistent with federal law. *See Knopick v. Connelly*, 639 F.3d 600, 606 (3d Cir. 2011) (applying state tolling principals); *Santos v. United States*, 559 F.3d 189, 193 (3d Cir. 2009) (applying federal tolling

---

[12] The Court notes "the discovery rule, which governs a claim's accrual date for statute of limitations purposes, is distinct from equitable tolling, which applies where circumstances unfairly prevent a plaintiff from asserting her claim. *Santos*, 559 F.3d at 199. In that regard, on a motion to dismiss, unlike equitable tolling, a plaintiff does not have the burden of pleading facts indicating the applicability of the discovery rule. *Schmidt*, 770 F.3d at 251. According to the Third Circuit, a court "may not allocate the burden of invoking the discovery rule in a way that is inconsistent with the rule that a plaintiff is not required to plead, in a complaint, facts sufficient to overcome an affirmative defense." *Id.* (citations omitted). Thus, "in the context of the discovery rule[,] when the pleading does not reveal when the limitations period began to run[,] the statute of limitations cannot justify Rule 12 dismissal." *Id.* (marks omitted).

principals); *Nicolas v. Ocean Plaza Condo. Ass'n*, 73 F. App'x 537, 540 (3d Cir. 2003) (noting that "federal tolling principles . . . apply to federal statutes of limitations"). Here, the Estate's FHA claim, as the only claim with a federal statute of limitations, is the only claim to which federal tolling applies. The Estate's ADA, Rehabilitation Act, § 1983, and NJLAD claims are governed by New Jersey's equitable tolling principals.

### a. Federal Tolling Doctrine

"Federal courts may toll statutes of limitations for federal laws where the plaintiff in some extraordinary way has been prevented from asserting his or her rights." *Frasier-Kane v. City of Phila.*, 517 F. App'x 104, 106 (3d Cir. 2013) (quoting *Lake v. Arnold*, 232 F.3d 360, 370 (3d Cir. 2000)) (quotations omitted). "But the remedy of equitable tolling is extraordinary" and federal courts "extend it only sparingly." *Frasier-Kane*, 517 F. App'x at 106 (quoting *Santos*, 559 F.3d at 197) (marks omitted). The Third Circuit has held that "mental incompetence, even rising to the level of insanity, does not toll a federal statute of limitations for claims." *Hedges v. United States*, 404 F.3d 744, 753 (3d Cir. 2005); *see also Lake*, 232 F.3d at 371 ("Mental incompetence is not per se a reason to toll the statute of limitations in federal actions."). And the FHA itself "does not provide a savings clause that would toll its statute of limitations for insanity." *Nicholas v. Ocean Plaza Condo. Ass'n*, Civ. No. 00-2589 (WHW), 2002 U.S. Dist. LEXIS 26755, at *14 (D.N.J. June 24, 2002). Consequently, William Smith's alleged mental incompetence does not toll the statute of limitations as to the Estate's FHA claim.

### b. New Jersey Tolling Doctrine

Under New Jersey law, statutes of limitations are tolled for any person with "a mental disability that prevents the person from understanding his legal rights or commencing a legal action at the time the cause of action or right or title accrues," until such time as that person regains the

mental capacity to pursue his rights. N.J.S.A. § 2A:14-21; *see also Nicolas*, 73 F. App'x at 541. Here, Plaintiff alleges "[b]efore his death, William suffered from dementia and Alzheimer's Disease" and on October 31, 2016, William Smith was involuntary committed by Somerset and the State because he supposedly "presented a danger to himself or others."[13] (ECF No. 47 at ¶¶ 3, 48.) Taking these allegations as true, it is plausible that at the time the Estate's claims accrued and for the entirety of the intervening period before his death, William Smith's mental disabilities prevented him from understanding his legal rights or commencing a legal action. Under these facts, William Smith's claims would be tolled until November 10, 2012, the date William Smith passed and Nancy Smith, who presumably had the mental capacity to understand the Estate's rights and commence a legal action, became the administrator of the Estate. Accordingly, it is appropriate on this Motion to Dismiss to toll the statutes of limitations as to the Estate's ADA, Rehabilitation Act, § 1983, and NJLAD claims until November 10, 2012.

For these reasons, only the following claims are dismissed with prejudice: (1) the Estate's FHA claim, insofar as it arises from Defendants' alleged failure to provide William Smith with adequate access to emergency services while he sheltered at his home and (2) all of Nancy Smith's claims, insofar as they arise from Defendants' alleged failure to provide her with adequate access to emergency services while she sheltered at her home.

### D.  Warren and Somerset's Immunity under the New Jersey Tort Claims Act ("TCA")

Warren argues that "[t]o the extent that plaintiffs' Brief suggests any causes of action based on tort liability (as had been pleaded in the original Complaint), those claims are barred by

---

[13] Although Plaintiff contends in the FAC that William's involuntary commitment was improper, she does not concede that, at the time, William had the necessary mental capacity to understand his legal rights or commence a legal action.

operation of the [TCA]."(Br. on Behalf of Def. Township of Warren in Supp. of Mot. to Dismiss Compl. with Prejudice for Failure to State a Claim (ECF No. 56-1) at 9.) Somerset likewise asserts:

> The claims against the [Somerset] should be dismissed because Plaintiff cannot prove his [sic] theory of liability pursuant to [the TCA]. Moreover, she has also failed to file the requisite Notice of Tort Claim pursuant to N.J.S.A. 59:8-3 through 8, et seq. whereby a plaintiff is required to file a Notice of Tort Claim within 90 days of the accrual of the cause of action.

(Mem. of Law in Supp. of Def's Mot. to Dismiss (ECF No. 55-1) at 2-3.) However, these arguments are irrelevant, because "the TCA only immunizes public entities and employees from liability for state law tort claims," and the FAC does not include such claims. *See Novellino v. N.J. Dep't of Corr. Mountainview Youth Corr. Facility*, Civ. No. 10-4542 (AET), 2011 U.S. Dist. LEXIS 85209, at *11 (D.N.J. July 28, 2011).

Of Plaintiff's five causes of action against Warren and Somerset, four arise under federal law: ADA claims (Count 1), Rehabilitation Act claims (Count 2), FHA claims (Count 3), and § 1983 claims (Count 4). The Supremacy Clause of the United States Constitution dictates that a state statute, such as the TCA, cannot provide immunity from a claim under a federal statute. *See Islam v. City of Bridgeton*, No. 08-1844, 2011 U.S. Dist. LEXIS 32411, 2011 WL 1205277, at *5 (D.N.J. Mar. 28, 2011) ("[B]ecause of the federal constitution's Supremacy Clause, [the TCA] does not apply to federal claims.") (citing *Tice v. Cramer*, 133 N.J. 347, 375 (1993) ("[T]he [TCA] provides no immunity from the federal claim.")). The TCA is similarly inapplicable to Plaintiff's only state law cause of action, the NJLAD claims (Count 5). The notice provisions of the TCA do not apply to claims asserted under the NJLAD. *Velez v. City of Jersey City*, 180 N.J. 284, 295 (2004) (citing *Fuchilla v. Layman*, 109 N.J. 319, 332-338 (1988)); *see also Garlanger v. Verbeke*, 223 F. Supp. 2d 596, 601 n.3 (D.N.J. 2002). Accordingly, Warren and Somerset's Motions to Dismiss are denied insofar as they seek to dismiss Plaintiff's claims as barred by the TCA.

## IV.   CONCLUSION

For the reasons set forth above, the Motions to Dismiss (ECF Nos. 55, 56, & 57) are **GRANTED IN PART** and **DENIED IN PART**. Nancy Smith's claims for prospective injunctive relief (Counts 1, 2, 3, & 5) are **DISMISSED WITHOUT PREJUDICE**. The Estate's claims for prospective injunctive relief (Counts 1, 2, 3, & 5) are **DISMISSED WITH PREJUDICE**. Both Nancy Smith and the Estate's FHA claims (Count 3) against State Defendants are **DISMISSED WITH PREJUDICE**, except Nancy Smith's claims against Christie and Fuentes are **DISMISSED WITHOUT PREJUDICE** insofar as they seek prospective injunctive relief. The Estate's FHA claim (Count 3) against Warren and Somerset is **DISMISSED WITH PREJUDICE** insofar as it arises from their alleged failure to provide William Smith with adequate access to emergency services while he sheltered at his home. Nancy Smith's claims (Counts 1, 2, 3, 4, & 5) are **DISMISSED WITH PREJUDICE** insofar as they arise from Defendants' alleged failure to provide her with adequate access to emergency services while she sheltered at her home. State Defendants' Motion to Dismiss is **DENIED WITHOUT PREJUDICE** insofar as it seeks to dismiss Plaintiff's ADA claim (Count 1) as barred by Eleventh Amendment sovereign immunity, and further **DENIED WITH PREJUDICE** insofar as it seeks to dismiss Plaintiff's Rehabilitation Act claims (Count 2) for failure to state a claim. Warren and Somerset's Motions to Dismiss are **DENIED WITH PREJUDICE** insofar as they seek to dismiss claims against these defendants as barred by the TCA.

Date: December 22, 2016                    */s/ Brian R. Martinotti*  
                                                    **HON. BRIAN R. MARTINOTTI**  
                                                    **UNITED STATES DISTRICT JUDGE**